UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ROB MCDERMOTT,

              Plaintiff,

v.

AVAYA, INC.,

              Defendant.

CASE NO. C13-6050 BHS

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Plaintiff Rob McDermott's ("McDermott") motion for partial summary judgment (Dkt. 19) and Defendant Avaya, Inc.'s ("Avaya") motion for summary judgment (Dkt. 25). The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby denies McDermott's motion and grants in part and denies in part Avaya's motion for the reasons stated herein.

**I. PROCEDURAL HISTORY**

On November 1, 2013, McDermott filed a complaint against Avaya in King County Superior Court for the State of Washington. Dkt. 1, Exh. 1. McDermott asserts

causes of action for breach of contract and for a violation of the Washington statute protecting employee's wages, RCW 49.52.050(2) ("WCS")[1]. *Id.*

On February 25, 2015, McDermott filed a motion for partial summary judgment on certain contract issues (Dkt. 19) and Avaya filed a motion for summary judgment on McDermott's claims (Dkt. 25). Both parties responded (Dkts. 34 & 39), and both parties replied (Dkts. 40 & 41). Both parties also filed a surreply. Dkts. 48 and 50.

## II. FACTUAL BACKGROUND

**A.  Employment**

In 2009 Avaya hired McDermott in a sales capacity. From 2011 to 2013 McDermott worked as a "Named Account Manager," which is a salesperson responsible for certain accounts instead of territories. Dkt. 20, Declaration of Tiffany Cartwright ("Cartwright Dec."), Exh. 4 at 1. Named Account Managers are compensated through a combination of base salary and commissions, which Avaya refers to as "target incentive" pay. *Id.*; Exh. 3.

During the relevant time period, McDermott's incentive compensation was subject to Avaya's Global Sales Compensation Policies and Avaya's fiscal year 2013 ("FY13") Sales Compensation Plan for Named Account Manager U.S. Dkt. 27, Declaration of

---

[1] McDermott incorrectly refers to this statute as the "Washington Rebate Act" or "WRA," but that is provision (1) of the statute. *See* RCW 49.52.050(1); *LaCoursiere v. Camwest Dev., Inc.*, 181 Wn.2d 734, 741 (2014). McDermott's claim is under provision (2) of the statute, which courts have commonly referred to as the "wage claim statute." *See, e.g., Morgan v. Kingen*, 141 Wn. App. 143, 155–56 (2007), *aff'd*, 166 Wn. 2d 526 (2009), *as corrected* (Nov. 9, 2009).

ORDER - 2

1  Jennifer Pirozzi ("Pirozzi Dec."), Exhs. A ("Policies") & B (collectively the "Plan

2  Documents"). Both Plan Documents contained a relevant provision as follows:

> Avaya reserves the right to: (1) amend, change, or cancel the Sales Compensation Plan [or Policies] or any elements of the Plan solely at its discretion; and (2) revise assigned territories, revenue[/order] quotas, reduce, modify, or withhold compensation based on individual/team performance or Avaya determination of special circumstances, with or without prior notice, and either retroactively or prospectively, except in countries where it is a violation of applicable law.

7  *Id*., Exh. A at 30 & Exh. B at 3 (the "right to amend" clause).

8  At the beginning of FY13, Avaya also gave McDermott a "condition sheet"

9  outlining accounts he agreed to take responsibility for, the quotas he agreed to meet, and

10  the commissions ("target incentives") Avaya agreed to pay if he met those quotas.

11  Cartwright Dec., Exh. 4. The condition sheet incorporated Avaya's FY13 Compensation

12  Plan and Policies, which provided more specific details regarding Mr. McDermott's

13  commissions. Although McDermott was to be compensated for three performance

14  measures, the measure relevant to this lawsuit is PM2. With regard to McDermott's PM2

15  quota, McDermott asserts, and Avaya does not contest, that PM2 was initially uncapped.[2]

16  Before participating in Avaya's sales compensation plan for FY13, Avaya

17  required McDermott to electronically sign his FY13 condition sheet. When McDermott

18  signed the sheet, he accepted a Declaration of Understanding, which provided as follows:

> I, the undersigned (employee), hereby acknowledge having received a copy of [the Plan Documents]. I acknowledge that I have read, understand

---

[2] McDermott cites internal emails in support of his position, but due to citation errors, the Court was unable to locate those emails. For this motion, it is sufficient that Avaya does not contest this fact.

and accept the terms and conditions of the Plan [Documents], and this condition sheet, all of which are applicable as of October 1st, 2012.

Pirozzi Dec., Exh. C at 3.

**B.     FY13**

After McDermott accepted Avaya's terms, he began working on sales in FY13. It is undisputed that McDermott "significantly exceeded his quota for PM2 very early in FY13." Dkt. 25 at 9. For example, McDermott's November compensation sheet showed that, for the first two months of FY13, McDermott was due $39,478.46 in commissions and his projected yearly commission was approximately $20,000. Cartwright Dec., Exh. 61. McDermott's high performance triggered an internal review of his commissions by Avaya's Americas Sales Compensation Review Board ("SCRB").

On January 22, 2013, Avaya informed McDermott via email that his PM2 commissions would be capped at 100% of his target payout pending official review. Pirozzi Dec., Exh. I. This email included a forward to McDermott of an email from Avaya's compensation group with the directive that the cap would apply "until an official review has been had." *Id*. McDermott's manager, Tim Bradlee, testified that the cap was "arbitrary." Cartwright Dec., Exh. B at 84 (deposition pagination).

After Avaya imposed the cap, McDermott raised objections to Mr. Bradlee. In response, Mr. Bradlee wrote McDermott as follows: "this doesn't mean you won't get that pay Rob. It only means they are holding it until we can properly justify . . . 500% to plan in Q1. I can understand the flag being raised . . . I will however make sure you get paid." *Id*. In that same email thread, Mr. Bradlee stated that he and his manager Troy

Behrends would "defend the [uncapped] quota setting and get you your money. But, this month you will be capped on PM2 to 100%." *Id*. Despite the cap, McDermott continued to secure sales, which would normally have resulted in PM2 commissions.

During the imposition of the 100% cap and before the SCRB reached a decision on its review, other employees argued that McDermott should receive a higher commission. For example, Scott Spehar, Vice President of Sales, wrote that "[q]uota was built consistently across all reps and Area" and that McDermott's "over-achievement is driven by; adding new sites . . . and up selling . . . what we want all sellers to do." Cartwright Dec., Exh. 27 at 6. Mr. Spehar also stated that "[t]he time for us to reset expectation is at the start of FY14. 'Not' in the middle of the year." *Id*. In another email to SCRB members, Mr. Spehar wrote: "Bottom-line - We followed the quota setting instructions for PM2 and Rob went out and did what we asked him to do find something new and upsell services. Changing his quota mid-stream is not right!" *Id*. at 4. Meanwhile, on March 19, 2013, Mr. Bradlee informed McDermott that Mr. Bradlee thought he had "persuaded [Mr. Spehar] to pay [McDermott] out on everything" and reassured McDermott that he would be "paid on the current commission owes AND Convergent [deal]." *Id*., Exh. 43 at 2.

On April 18, 2013, the SCRB issued a decision setting McDermott's cap at 200% of his PM2 quota. The decision was confirmed by an email of that date from Lisa Wiese, Avaya's Sales Operations Manager, recording the SCRB's discussion that morning. Pirozzi Dec., Ex. J. Later that day, Mr. Bradlee, informed McDermott of the decision by forwarding those SCRB emails to McDermott. *Id*. As a result of this SCRB decision,

1  McDermott was paid a total of $65,495.93 for the PM2 component for FY13,

2  representing the commission for 200% attainment of his PM2 sales quota. Dkt. 26,

3  Declaration of Lisa Wiese ("Wiese Dec."), ¶2.

4      Between the April review and the end of FY13, McDermott asserts that Avaya

5  never told him that the 200% cap was permanent. Mr. McDermott claims that his

6  understanding was that the cap meant "we're going to pay you up to this amount for

7  now," and that Avaya would continue to review his compensation, and pay him in full

8  once the year-end data was finalized. Cartwright Dec., Exh. E (McDermott Deposition)

9  at 180:21-181:19; 185:22-187:12. On May 11, 2013, Mr. Bradlee wrote to Troy

10 Behrends and Irene Benavidez stating that the "200% cap was for all deals up to that

11 point, not for the year. [They] knew Convergent would be coming in after that and Rob

12 worked to convert that account to SA Preferred." *Id.*, Exh. 31 at 2.

13     Ultimately, Avaya did not increase McDermott's cap, which resulted in a

14 commission of $65,495.93. If the commission would not have been capped, McDermott

15 claims that he would have been entitled to $239,340.61. This lawsuit was filed shortly

16 after FY13 was completed.

17                         **III. DISCUSSION**

18 **A.**      **Motions to Strike**

19     Both parties filed a surreply, and both parties are aware that it is improper to

20 include new argument or evidence in a reply brief. McDermott improperly raised the

21 issue that a portion of the relevant contract was substantively unconscionable. Dkt. 40 at

22 7. Avaya submitted additional declarations with its reply. *See* Dkts. 42 & 43. Therefore,

the Court grants the motions to strike and will ignore this additional argument and evidence presented for the first time in reply.

**B.     Summary Judgment**

In this case, McDermott moves for summary judgment on the issues that (1) the FY13 condition sheet was a bilateral contract that could only be modified by mutual assent and (2) Avaya's "right to amend" clause is unenforceable in Washington because it violates the WCS. Dkt. 19. On the other hand, Avaya moves for summary judgment on McDermott's breach of contract claim, breach of good faith and fair dealing claim, promissory estoppel claim, and statutory failure to pay wages claim. Dkt. 25. The Court will address each issue.

**1.     Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists

if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**2.     Contract**

"A bilateral contract is one in which there are reciprocal promises. The promise by one party is consideration for the promise by the other. Each party is bound by his promise to the other." *Ebling v. Gove's Cove, Inc.*, 34 Wn. App. 495, 499 (1983) (citing *Cook v. Johnson*, 37 Wn.2d 19, 23 (1950); *Higgins v. Egbert*, 28 Wn.2d 313 (1947)).

In this case, McDermott argues that the parties' bilateral contract could only be modified by mutual assent. The law, however, is quite clear that, if the parties agree that

one party may amend the contract without mutual assent, then that party may amend the contract without mutual assent. In *Nye v. Univ. of Washington*, 163 Wn. App. 875 (2011), the court addressed "the interpretation of several provisions in the university handbook regarding faculty salary." *Id*. at 877–878. The plaintiff contended "that the handbook is a bilateral contract, which the president and board may not unilaterally amend." *Id*. at 886. The court dismissed this argument as follows:

> Even if Nye is correct, any distinction between bilateral and unilateral contracts makes no difference when the provisions of that contract allow for the modification that occurred. The handbook's express terms warn faculty that the provision of merit raises may be reevaluated, allow the president to issue executive orders, and state that the board may modify rules formulated by the president or faculty.

*Id*. Applying that law to the facts of this case, the Court finds McDermott's position is without merit because the relevant contracts specifically warn McDermott that Avaya can modify his commission for any reason retroactively.[3] Therefore, the Court denies McDermott's motion on the issue of enforceability of the right to amend provision.

With regard to Avala's motion, McDermott argues that Avaya is not entitled to summary judgment on the breach of contract claim. Dkt. 34 at 12–18. McDermott advances a number of unorganized reasons to support his position, which the Court will attempt to address. First, the Court agrees with McDermott that the "right to amend"

---

[3] McDermott attempts to distinguish *Nye* as a factual matter, but he references the trial court's ruling that the university erred when it amended the contract without following the specific amendment procedures outlined in the relevant contract. Dkt. 40 at 5. This argument fails for at least two reasons: (1) that decision wasn't appealed because those particular plaintiffs settled before the appeal and (2) there is no allegation that Avaya failed to follow any procedure outlined in the relevant contract.

1  clause does not make the promise of a commission illusory. As set forth in *Nye*, the

2  Court is obligated to enforce the mutual exchange of promises, including Avaya's

3  warning to McDermott that commissions could be modified retroactively.

4  Second, the Court also agrees with McDermott that the contract may violate

5  provisions of the WRA, but, for purposes of clarity, will address these issues in a separate

6  section. Even if the contract violates the statute, McDermott has failed to provide

7  authority for the proposition that a violation of the statute supports a claim for breach of

8  contract.

9  Third, McDermott argues that Avaya was required to give McDermott reasonable

10 notice before it could cap his commissions on a prospective basis. Dkt. 34 at 17–18.

11 This argument is without merit because McDermott fails to cite any provision in the

12 relevant contracts that supports such a proposition and the case law McDermott cites does

13 not authorize the Court to rewrite the relevant contract to include such a provision.

14 Finally, the parties dispute the significance of McDermott's managers' statements

15 regarding paying McDermott. Avaya contends that the contract controls and that no

16 manager had the actual or apparent authority to alter the terms of the contract. Dkt. 25 at

17 19. On the other hand, McDermott contends that the managers' comments were

18 consistent with the plan and that the contract does state that McDermott's immediate

19 manager could approve changes to target incentives, i.e. commissions. Dkt. 34 at 22–23.

20 Based on the language of the Plan Documents, McDermott has the better argument.

21  The Policies document contains a "Schedule of Authorizations" section. Policies

22 at 31–37 (original document pagination). In that section, Avaya included a chart titled

"Condition Sheet Authorization and Documentation Requirements." *Id*. at 37. McDermott directs the Court's attention to one row of that chart wherein it provides that "Changes in Total (and Component) Target Incentive" require approval from only the "Sales Associate" and the "1-over-1 Manager." *Id*. McDermott argues that, "[A]t the very least, this portion of the Policies create genuine issues of material fact as to whether [he] was justified in believing his supervisors' statements that he would be paid." Dkt. 34 at 23. The Court agrees and notes that this may even rise to the level of an ambiguity in the contract that should be construed against the drafter, which is Avaya.[4] Therefore, the Court denies Avaya's motion on McDermott's breach of contract claim.

### 3. Good Faith and Fair Dealing

"Under Washington law, '[t]here is in every contract an implied duty of good faith and fair dealing' that 'obligates the parties to cooperate with each other so that each may obtain the full benefit of performance.'" *Rekhter v. State, Dep't of Soc. & Health Servs.*, 180 Wn.2d 102, 112-13 (2014) (quoting *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569 (1991)). In particular, the duty of good faith and fair dealing arises "when the contract gives one party discretionary authority to determine a contract term." *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn.App. 732, 738 (1997). It may violate the duty of good faith and fair dealing to, for example, (1) evade the spirit of a bargain; (2) willfully render imperfect performance; (3) interfere with or fail to cooperate in the other

---

[4] Avaya failed to respond to this specific argument. While Avaya did address the previous pages of the document, Avaya did not address McDermott's argument based on the "Condition Sheet Authorization and Documentation Requirements." *See* Dkt. 41 at 13–14 (addressing pages 31–36 of the plan, but not page 37).

ORDER - 11

1  party's performance; (4) abuse discretion granted under the contract; or (5) perform the

2  contract without diligence.  Restatement (Second) of Contracts § 205 cmt. d.  It is the fact

3  finders job to determine whether a party breached its duty of good faith and fair dealing.

4  *See, e.g., Columbia Park Golf Course, Inc. v. City of Kennewick*, 160 Wn.App. 66, 77–78

5  (2011).

6        In this case, Avaya argues that McDermott's "claim fails because that theory

7  cannot be used to contradict Avaya's express contractual right to change the

8  compensation plan at any time, without notice and retroactively."  Dkt. 25 at 16.

9  McDermott, however, has shown that material questions of fact exist on this issue to

10  preclude summary judgment.  It is undisputed that Avaya reserved the right to amend

11  commissions "solely at its discretion."  Even so, McDermott states a valid claim for

12  breach of this covenant if Avaya abused that discretion.  *See* Restatement (Second) of

13  Contracts § 205 cmt. d.  In *Tymshare, Inc. v. Covell*, 727 F.2d 1145 (D.C. Cir. 1984), the

14  court interpreted a similar provision and persuasively stated that the phrase "within [its]

15  sole discretion . . . is not necessarily the equivalent of 'for any reason whatsoever, no

16  matter how arbitrary or unreasonable.'"  *Id*. at 1154.  The Court agrees, and McDermott

17  has submitted evidence that the 100% temporary cap as well as the 200% permanent cap

18  were arbitrary and unreasonable to McDermott.  Moreover, at least two of McDermott's

19  managers wrote that the cap was, at the very least, arbitrary and unreasonable.  In fact,

20  Avaya even admits that McDermott's manager, Mr. Bradlee, sent McDermott an email

21  stating that, in his opinion, the cap "was wrong."  Dkt. 41 at 14–15 (citing Plaintiff's Exh.

22

#41).  Regardless of Avaya's tardy explanation for the permanent cap,[5] McDermott has shown that material questions of fact exist on this issue.  Therefore, the Court denies Avaya's motion on McDermott's claim for breach of the duty of good faith and fair dealing.

**4.    WCS**

"The state legislature has shown a strong policy in favor of ensuring payment of wages by enacting criminal and civil penalties for the willful failure to pay employees the wages they have earned."  *Morgan*, 141 Wn. App. at 152.  Pursuant to RCW 49.52.050(2), it is unlawful to "[w]ilfully and with intent … deprive the employee of any part of his or her wages, . . . pay any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract."  While it is undisputed that commissions are considered wages, the "right to commissions is dependent upon the terms of the contract."  *Willis v. Champlain Cable Corp.*, 109 Wn.2d 747, 751 (1988) (citations omitted).

In this case, McDermott argues that the "right to amend clause" is unenforceable because it violated the WCS.  Dkt. 19 at 15–17.  Avaya responds that McDermott is incorrect for three independent reasons: (1) commissions were not earned until Avaya exercises its "right to amend," (2) Avaya did not retroactively withhold earned commissions, and (3) Avaya's actions were not "willful" under the statute.  Dkt. 39 at 15-21.  With regard to the first two reasons, the issues turn on the breach of contract claim.

---

[5] *See* Dkt. 42 (declaration submitted with reply).

If McDermott can show that he was owed more pursuant to the terms of the contract, then he was paid a lower wage than Avaya was obligated to pay him.

With regard to willfulness, an employer does not willfully withhold wages within the meaning of RCW 49.52.070 where it has a bona fide belief that it is not obligated to pay them. *Schilling v. Radio Holdings, Inc.*, 136 Wn.2d 152, 161 (1998). Determining willfulness is a question of fact. *Pope v. University of Washington*, 121 Wn.2d 479, 490 (1993). One Washington court has explicitly stated that an employer's "decision to alter the contract and the parties' past practice to its own benefit does not create a fairly debatable dispute." *Backman v. Nw. Pub. Ctr.*, 147 Wn. App. 791, 797 (2008).

In this case, Avaya has failed to show that no reasonable juror could find for McDermott on the issue of willfulness. Avaya made an intentional decision to cap McDermott's commission because he was successfully doing what they wanted him to do, upsell. Other Avaya employees stated that the cap was not right and that McDermott would ultimately be paid in full. The Court finds that this is sufficient evidence to create a question of fact on willfulness. Therefore, the Court denies Avaya's motion on McDermott's WCS claim.

**5.     Promissory Estoppel**

The purpose of the doctrine of promissory estoppel is to make a promise binding under certain circumstances. The doctrine applies where there is

> (1) A promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise.

ORDER - 14

*Corbit v. J. I. Case Co.*, 70 Wn. 2d 522, 539 (1967).  The doctrine, however, "does not apply where a contract governs." *Spectrum Glass Co. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 129 Wn. App. 303, 317 (2005) (citing *Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wn.2d 255, 261 n. 4 (1980)).

In this case, McDermott's promissory estoppel claim fails because the parties entered into a written contract that governed commissions.  Therefore, the Court grants Avaya's motion on McDermott's promissory estoppel claim.

## IV. ORDER

Therefore, it is hereby **ORDERED** that McDermott's motion for partial summary judgment (Dkt. 19) is **DENIED** and Avaya's motion for summary judgment (Dkt. 25) is **GRANTED in part** and **DENIED in part** as set forth herein.

Dated this 14th day of April, 2015.

BENJAMIN H. SETTLE
United States District Judge